224 N.J. Super. 648 (1988)
541 A.2d 251
ROBERT CHOBOT, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
OLIVE CHOBOT, DEFENDANT-RESPONDENT, CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 29, 1988.
Decided May 2, 1988.
*649 Before Judges BAIME and ASHBEY.
Gruber & Associates, attorneys for appellant (Mark Gruber, on the brief).
Legal Aid Society of Morris County, attorney for respondent (Robin C. Kiel, on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
The novel issues raised by this appeal are the applicability of child support guidelines, R. 5:6A, to motions to increase child support and the computation of available parental income under R. 5:6A. We today hold that the child support guidelines do apply to motions to increase child support and that payments to amortize debt created by consumer spending, life insurance *650 premiums or non-mandatory retirement contributions are not deductible when calculating available parental income.[1]
By judgment dated June 5, 1984, plaintiff husband and defendant wife were divorced. The final judgment incorporated a property settlement agreement signed by plaintiff on February 10, 1984 and by defendant on December 22, 1983. On January 9, 1987, defendant filed a motion for an increase in child support. Following oral argument the Family Part judge ordered that child support for the parties' four children be increased from $70 to $105 per week; that plaintiff be responsible for one-half of all uncovered medical expenses of the children; that support payments be made through the Morris County Probation Department; that support arrears be fixed at $1,053.32 as of March 7, 1987; that plaintiff pay $20 per week toward the arrears and that if plaintiff were to miss two consecutive payments, a wage execution would issue. Plaintiff moved for reconsideration which was denied.
Plaintiff appeals from the ensuing orders of March 16, 1987 and May 11, 1987, and by leave granted defendant cross-appeals from the amount of support ordered.
On appeal plaintiff contends that,
Point I.
The court's modification of the property settlement agreement was not supported by evidence of a substantial change of circumstances.
Point II.
The child support guidelines enacted by court rule were improperly applied retroactively.
In her cross-appeal defendant contends that,
The trial judge abused his discretion by considering plaintiff's consumer debts, pension fund payments, retirement fund and life insurance expenses when computing child support payments.
*651 The record reveals that the parties were married on September 28, 1969. Four children were born of the marriage: Theresa, born April 24, 1970; Sharon, born July 21, 1972; Mandy, born January 4, 1976, and Robert, born September 9, 1978. When the parties separated in 1982, plaintiff agreed to pay $70 per week in child support for the children, who remained in defendant's custody. On December 22, 1983, defendant, without advice of counsel, signed a divorce agreement which had been prepared by plaintiff's attorney. Plaintiff was then working in the maintenance department at Greystone State Hospital, where he had been employed for nine years. Defendant was then only contributing $300 per month for rent and utilities for herself and the children. Transportation was provided her by her future husband. Defendant and her second husband were married. They separated in the summer of 1986.[2] At the time of the hearing defendant's second husband was paying $50 per week voluntarily to her for support of their child. In November of 1986, plaintiff stopped paying child support to defendant.
From the parties' submissions, the judge found that defendant received $200.28 per week net from her full time employment, $70 per week from plaintiff and $50 per week from her second husband, giving her $1,379.20 monthly available income for one adult and five children. Defendant also received $204 per month in foodstamps.[3] Her monthly expenses totalled $1,883.55, leaving her with a monthly shortfall of $504.35. She certified that she owed utility bills of over $600, and rent of over $200.
*652 Plaintiff, who lived with his second wife, their daughter and his step-daughter, was still employed full time by Greystone State Hospital and part time (20 hours per week) by Quick Check, earning $21,573.76 a year gross. Plaintiff deducted a total of $4,451.30 in taxes from his gross income. His monthly income after taxes was $1,462.87. Additionally, plaintiff listed $4,070.82 in annual after-tax deductions, representing dental insurance ($258.18), medical insurance ($298), life insurance ($110), pension ($575), wage executions ($1,825), retirement fund payments ($894.14) and union dues ($110.50) leaving him with a net earned monthly income according to his calculations of $1,087.64. He asserted additional living expenses, including a $203.02 car payment, of $1,472.77 monthly.
Plaintiff certified that he had stopped paying support because his second wife had been ill. He said that in November of 1986 his wife had begun a part-time job but was injured in a car accident. He also claimed that his poor health caused him to cut down the hours on his part-time job. In his case information statement plaintiff said that he owed nine creditors $11,443 and that his wife owed 25 creditors $12,674, of which $7,014 was for her car. At oral argument plaintiff admitted that over $2,000 of debt was for various consumer goods purchased at Bamberger's and J.C. Penney's.
The judge computed plaintiff's obligation in accordance with the child support guidelines as set forth in R. 5:6A as follows:

 Plaintiff's net weekly income $252.94[4] (56%)
 Defendant's net weekly income 200.28 (44%)
 Total ______
 453.22 (100%)

*653
 Weekly child support $188.00
 Plaintiff's contribution 105.00
 Defendant's contribution 83.00

On appeal plaintiff first contends that defendant was not entitled to an increase because she did not establish a change of circumstances. He relies upon the judge's statement in his statement of reasons that, "the file does not contain any Preliminary Disclosure Statements or other financial information that would allow a comparative analysis of the income earned by the parties, or either of them, when they were divorced or their present earnings." Plaintiff further asserts that, despite the fact that he did not request one, he was entitled to a hearing to disclose whether plaintiff transferred assets to defendant which she could use to support the children[5] and to determine the needs of the children as well as the parties' abilities to pay.
We find this argument unpersuasive. N.J.S.A. 2A:34-23. Under Lepis v. Lepis, 83 N.J. 139, 145-146 (1980), changed circumstances may include (1) an increase in the cost of living, (2) a change in the contributing spouse's income, (3) subsequent illness or disability, (4) the non-contributing spouse's loss of a house or apartment, (5) the non-contributing spouse's cohabitation with another, (6) subsequent employment of the non-contributing spouse, (7) changes in federal income tax law, and (8) the maturation of the children. Id. at 151 (citations omitted). Defendant's submissions established the maturation of the children (aged 14, 12, 8 and 5 at the time of divorce and 17, 15, 11 and 8 at the time of the hearing) and her $400 a month loss of *654 outside contribution to her fixed expenses. She also asserted that she had an increased transportation expense.[6] None of these facts were disputed by plaintiff.[7] He thus failed to demonstrate the existence of a genuine issue as to a material fact justifying a hearing. Id. at 159; Shaw v. Shaw, 138 N.J. Super. 436, 440 (App.Div. 1976).
Plaintiff also asserts that the trial court's application of the child support guidelines imposed a manifest injustice upon him because his agreement was based upon the law as it existed at the time of his divorce.
R. 5:6A provides:
The guidelines set forth in Appendix IX of these Rules shall be applied when an application for support, made pursuant to any section of these Rules, is considered by the court. The guidelines may be modified or disregarded by the court only where good cause is shown. Good cause shall consist of (a) the considerations set forth in Appendix IX-A or the presence of other relevant factors which may make the guidelines inapplicable or subject to modification, and (b) the fact that injustice would result from the application of the guidelines. In all cases, the determination of good cause shall be within the sound discretion of the court.
We are satisfied that the court properly reviewed the current circumstances of the parties according to the guidelines, despite a prior agreement. Plaintiff had no vested contract right which might defeat his obligation to meet the needs of his dependents. See Lepis v. Lepis, supra, 83 N.J. at 145-146.[8] The Family *655 Part judge's conclusion that there was a change of circumstances concerning the needs of the four children was supported by the record and the child support guidelines were relevant to determine plaintiff's financial obligation.
We agree with defendant on the cross-appeal, however, that, to the extent the trial court reduced plaintiff's available annual income by $3,404, representing life insurance, unsubstantiated pension and retirement contributions and wage garnishments, the court erred.[9]
On this issue the trial judge issued a statement of reasons. He said,
In his Case Information Statement the plaintiff deducts the sum of $1,825.00 per year for wage executions before arriving at a net monthly income of $1,087.64 or $252.94 per week. While there may be some dispute with respect to whether or not the debts set forth by the plaintiff are legitimate deductions for purposes of arriving at his net income the court is satisfied that it would be unreasonable to completely ignore the economic realities of the present situation. Mr. Chobot and his wife have incurred a significant amount of debts and it is going to take a significant period of time to satisfy those debts. It appears that there may be some economic relief in sight for the plaintiff since it now appears that his wife is in a position to return to work following a lengthy period of disability.
Plaintiff's counsel represented that the wage executions were for the following debts: (1) Hayne's department store, $300 (for plaintiff and all his children); (2) Medical Associates, $295.27 (for plaintiff and his wife); (3) Dr. Martin, $170.14 (for plaintiff); (4) First Fidelity Bank, $4,078.05 (plaintiff's personal loan to repay accumulated debts); (5) Bamberger's department store, $1,729.96 (for plaintiff, his children and his wife); (6) Mastercard, $1,446.95 (for plaintiff's attorney's fees); (7) J.C. Penny's department store, $573.99 (for plaintiff's wife's and his wife's daughter's dresses), and (8) American Express, $350 (for *656 plaintiff's car rental). The record does not reflect whether these wage executions were voluntary. Plaintiff stated in his certification that he had eight garnishments on his salary. Concerning the pension, plaintiff's counsel asserted at oral argument that his contribution was mandatory. The relationship between plaintiff's retirement fund and his pension contributions was not explored.
The child support guidelines detail how to calculate net available parental income. Starting with gross income, a parent is credited with mandatory deductions for state, federal and local taxes, social security, mandatory retirement contributions and union dues. Allowable exemptions also include unreimbursed premiums for medical and dental insurance and support orders in other support cases (see Pressler, Current N.J.Court Rules, Appendix IX-D (1988)). There is no question but that the challenged deductions were not permissible. Plaintiff asserts that the application of the guidelines was not required, however, but, rather, discretionary.
The extent to which the Family Part judge remained free to determine "economic realities" following promulgation of the support guidelines must be judged in light of preceding legislative history. The support guidelines were implemented according to the mandate of the Federal Child Support Enforcement Amendments of 1984, 42 U.S.C.A. sec. 651 et seq. which are part of a federal and interstate cooperative effort designed to secure parental assumption of support obligations.[10] The amendments made federal subsidies and incentive payments contingent upon state compliance with specific federal requirements. The coercive nature of the amendments was intended to enlist active state participation toward the eradication of the *657 persistent financial instability of single parent families.[11]
In particular, 42 U.S.C.A. sec. 667 required the several states to devise objective criteria by October 1, 1987 to assist the determination of child support awards.[12] The Office of Child Support Enforcement further added that the guidelines be based on "specific descriptive and numeric criteria and result in a computation of the support obligation." 45 C.F.R. sec. 302.56 (1987). Objective calculation of child support obligations was designated to eradicate the inconsistent awards reached by subjective evaluation which often failed to meet the basic needs of the children. A Guide for Judges in Child Support Enforcement, supra, at 51.[13] Although the guidelines were not to be binding on the decision process, each state was required to disseminate them to all judges and personnel responsible for child support computations. 45 C.F.R. sec. 302.56 (1987).
*658 In the light of this federal mandate, the Family Division Practice Committee of the Supreme Court appointed a subcommittee to develop an appropriate child support guidelines model, which became the basis for R. 5:6A. The subcommittee made a report in which it also noted the increase in the number of single parent households and the inadequacy and inconsistency of then existing support awards, 116 N.J.L.J. at 826 (Subcommittee Report 1985). The subcommittee's recommended model, which varied significantly from other models, aimed to apportion support obligations between both parents based on their relative contributions to the combined family income, in order to provide the children with substantially the same support that they would have received if the family remained intact. Id. at 825-826; see also Pressler, Current N.J.Court Rules, Comment R. 5:6A (1988).[14] We discern no justification for allowing for the deduction of consumer debts.
Plaintiff further argues that, assuming the guidelines were applicable, the judge applied the "good cause" exception for deviation which the guidelines provide for. R. 5:6A refers specifically to Appendix IX-A for "good cause" factors.
Considerations which may make these child support guidelines inapplicable or cause the child support amount to be adjusted are:
1. These tables and procedures are not generally intended to apply to parents with a combined net income which is below the poverty level (as set forth in the Federal Register) or in excess of $42,000 per year. Parents at these extreme income levels should be subject to child support orders based upon individual case review. However, obligor parents earning less than the poverty level shall be ordered to pay a nominal child support amount to *659 establish the principle of payment and lay the basis for increased orders if income increases in the future (See Appendices IX-B and IX-C).
2. These child support guidelines are based upon traditional custody and visitation arrangements.
3. These child support guidelines do not take into account the economic impact of the following factors:
(a) spousal support;
(b) equitable distribution of property;
(c) tax consequences;
(d) fixed direct payments;
(e) unreimbursed extraordinary medical/dental expenses for the obligor parent;
(f) educational expenses for the child(ren) or the spouse (i.e. those incurred for private, parochial, or trade schools, other secondary schools, or post-secondary education where there is tuition or other costs beyond state/local tax contributions);
(g) verified non-court ordered support needs of children from other relationships;
(h) families having more than six (6) children.
* * * * * * * *
The above enumerated considerations should not limit the Court from taking into account other significant factors which may cause these child support guidelines to be inapplicable or cause the child support amount to be adjusted.
Conspicuously absent from this list is debt created by consumer spending, life insurance or non-mandatory retirement contributions. Under the New Jersey Support Enforcement Act (N.J.S.A. 2A:17-56.7 et seq.), it is clear that the legislature did not intend that a child's needs would be deferred to those of a parent's creditors. "On any order modifying ... child support based upon changed circumstances, the income withholding ... shall have priority over any other withholdings without regard to the dates of the other income withholding." N.J.S.A. 2A:17-56.10b (emphasis added).[15]
*660 The Chancery Division recently held that to allow an employer's right to a set-off to take priority over a child support obligation "would run contrary to the strong public policy of enforcing child support obligations." Galpen v. Galpen, 221 N.J. Super. 532, 540 (Ch.Div. 1987). In so holding, the court relied upon Justice O'Connor's concurring opinion in Rose v. Rose, 481 U.S. ___, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987) where she wrote, "Our Anglo-American tradition accords a special sanctity to the support obligation. Unlike other debts, for example, the obligation to support spouse and child is enforced on threat of contempt. These obligations, moreover, may not be discharged in bankruptcy. 11 U.S.C. sec. 523(1)(5)." Id., 481 U.S. at ___, 107 S.Ct. at 2040, 95 L.Ed.2d at 615.
The Subcommittee Report of 1985 also emphasized that effectiveness of the guidelines depended on the method of calculating each spouse's available income. The ability to pay for parental goods and services was separated from relevant available parental income. 116 N.J.L.J. at 826-827 (Subcommittee Report 1985). The only articulated caveat was that the obligated spouse must be able to maintain a minimum adequate standard of living as defined by federal standards, 116 N.J.L.J. at 826.
Because we are persuaded that relevant child support guidelines were not applied, we remand the matter to the trial court to make a redetermination of child support after considering appropriate submissions by the parties and the guidelines. We do not pass upon the question of whether plaintiff's submissions, if properly related to the guidelines, represented "good cause" for deviation.
The order appealed from is otherwise affirmed.
NOTES
[1] We emphasize that a finding that child support as agreed upon was inadequate when compared with the guidelines is distinguishable from a finding that agreed upon child support exceeds the guidelines. We do not suggest that the same principles there apply.
[2] At the time of defendant's motion, they were not divorced.
[3] When calculating defendant's available child support income, the judge excluded the value of foodstamps. Although the guidelines do not expressly exclude foodstamps in computing net income, they do exclude Aid to Families with Dependent Children benefits and we consider the exclusion (which is not appealed from) to have been proper. See Rose v. Rose, 481 U.S. ___, ___, 107 S.Ct. 2029, 2041, 95 L.Ed.2d 599, 615 (1987). See also 7 U.S.C.A. sec. 2017(b) (food stamps not to be considered income for any purpose under state law).
[4] Using the judge's analysis, the figure should be $250.99 ($13,051.64 divided by 52). $13,051.64 is computed as follows: $21,573.76 gross income, less $4,451.30 mandatory tax deductions, less $4,070.82 other deductions. Discrepancies in the judge's calculations may be partially related to plaintiff's differing statements concerning his mandatory deductions.
[5] Plaintiff fails to detail what assets these might be.
[6] Neither party challenged the fact that the cost of living in the New York and Northern New Jersey area, as measured by the Consumer Price Index, had increased between the time the settlement was executed and the time that the modification order was entered.
[7] That defendant's monthly expenses exceeded her income is supported by her eligibility to receive foodstamps.
[8] See also Subcommittee on Judicial Support Guidelines Report to the Family Division Practice Committee of the New Jersey Supreme Court, reprinted at 116 N.J.L.J. 813, 827 (1985) (Subcommittee Report 1985), which specifically recommended that the guidelines "may be used to examine the appropriateness of negotiated agreements and in the updating of support awards to ensure that support amounts are in the best interest of the child."
[9] Defendant asserts particularly that the credit for consumer debt was improper. In the alternative, she argues that the court should have considered her short-term debts totalling $1,145.16 for unpaid bills for heat, utilities, rent and telephone when calculating her available income.
[10] See Title IV-D of the Social Security Act of 1975, Part B of P.L. 93-647 (codified at 42 U.S.C.A. Sec. 651) which created the Program for Child Support Enforcement and Establishment of Paternity.
[11] In 1984, according to the census over 3.5 million poverty level families were maintained by mothers, representing 48% of all proverty-stricken households. U.S. Bureau of the Census, Money Income and Poverty Status of Families and Persons in the United States: 1984; Money Income and Poverty Status of Families and Persons in the United States: 1986, U.S. Government Printing Office, Washington, D.C. The low income level of families headed by mothers had been attributed to non-support of children by absent fathers. U.S. Department of Health and Human Services, A Guide for Judges in Child Support Enforcement (2d ed.) at 3.
[12] A 1975 regulation required the states to establish an objective, numeric formula to guide child support computations but as of August 1983, 29 states had failed to do so. See 45 C.F.R. sec. 302.53; A Guide For Judges in Child Support Enforcement, supra, at 51. See 56 U.S.L.W. 2191.
[13] The United States Department of Health and Human Services reported that in 1981, only 59% of those mothers with minor children where the father was not present were awarded child support. See A Guide for Judges in Child Support Enforcement, at p. 3. This is contrasted with the historical fact that women, particularly those with custody of children, earned significantly less in the workforce than their male counterparts. See generally Money Income and Poverty Status of Families and Persons in the United States: 1984 supra; U.S. Bureau of the Census, Characteristic of the Population Below the Proverty Level: 1983, U.S. Government Printing Office, Washington, D.C., 1985.
[14] Relevant to that analysis is the following. Defendant's income, including the $105 child support award, was $305 a week to support herself and four children. Assuming plaintiff's second wife's income was required for the support of herself and her child, (who also received support from her father), plaintiff had $211 a week (after allowable deductions and paying the $105 child support) to support himself and his fifth child. The relative per capita income was thus $105 per week per person to support plaintiff's new family (excluding his wife and her child) and $61 per person for plaintiff's former family, defendant and their four children (excluding defendant's new child).
[15] We note that neither party has raised the question of the applicability of the New Jersey Parentage Act (N.J.S.A. 9:17-38 et seq. and N.J.S.A. 9:17-53e(9)) which provides that all relevant facts, including debts and liabilities of each child and parent, shall be considered when determining support obligations. While we do not view "debts" within the meaning of that section to include voluntarily incurred debts such as those here referred to (see Assembly Judiciary, Law, Public Safety and Defense Committee Statement Senate, No. 888, reprinted following N.J.S.A. 9:17-38), the Act was not here invoked respecting a dispute concerning support obligations previously agreed to between acknowledged parents.